UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

SHARON JOHNSTON,                    :
    Petitioner,                         :
                                  :
    v.                                  :       Case No.   2:10-cv-180-FtM-29DNF
                                    :
                                  :
UNITED STATES OF AMERICA,            :
    Respondent.                         :

**UNITED STATES' RESPONSE IN OPPOSITION TO PETITIONER'S
MOTION TO VACATE, SET ASIDE,
OR CORRECT SENTENCE, PURSUANT TO 28 U.S.C. § 2255**

Pursuant to 28 U.S.C. § 2255, the Rules Governing Section 2255 Proceedings, and this Court's March 29, 2010 order, the United States responds in opposition to petitioner's motion to vacate, set aside, or correct sentence as follows:

**I.     STATEMENT OF CASE AND FACTS**

**A.     STATEMENT OF THE CASE**

1.      A four-count Indictment filed against the Petitioner on August 29, 2007, in the Middle District of Florida, Fort Myers Division, charged in Count One that on or about June 11, 2007, Sharon Johnston acted outside the scope of professional practice by dispensing Oxycodone and Alprazolam, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).  Doc. 9.

2.      Count Two charged that on or about June 27, 2007, Sharon Johnston acted outside the scope of professional practice by dispensing Oxycodone, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).  Doc. 9.

3.      Count Three charged that on or about July 5, 2007, Sharon Johnston acted outside the scope of professional practice by dispensing Alprazolam and Methadone, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).  Doc. 9.

4.      Count Four charged that on or about July 10, 2007, Sharon Johnston acted outside the scope of professional practice by dispensing Oxycodone, in violation of title 21, United States Code, Section 841(a)(1) and 841(b)(1)(C).  Doc. 9.

5.      The defendant pled not guilty and proceeded to trial, which was presided over by United States District Judge John E. Steele.  After a four day trial, on March 21, 2008, the defendant was found guilty of all counts, and the Court adjudicated the defendant guilty.

6.      The District Court sentenced the Petitioner to thirty (30) months imprisonment, to be followed by three (3) years supervised release.  Doc. 86.

**B.      FACTS**

7.      Physicians who specialize in pain management generally use a variety of therapies to treat patients, including prescribing appropriate medications, using injections, and assessing the pain on a regular basis.  Doc. 89 at 469.  Some physicians may prescribe substances that are controlled by the government, but the physician must obtain a special license from the Drug Enforcement Administration in order to prescribe controlled substances.  Doc. 89 at 470, 473-74.  Controlled substances are specified on government "schedules," which identify the risk of addiction and abuse.  Doc. 89 at 474.  Roxicodone (the brand name of oxycodone) and methadone are Schedule II

2

substances.  Doc. 89 at 474; Doc. 90 at 601.  Xanax (the brand name of alprazolam) is a Schedule IV substance.  Doc. 89 at 195; Doc. 90 at 601.

8.      Roxicodone, which comes in 15-milligram and 30-milligram tablets, is a short-acting, opioid pain medication, intended to be used for breakthrough pain.  Doc. 89 at 475.  It is the same medication as Oxycontin, but Oxycontin is in time- released form.  Doc. 89 at 512.  It is addictive, and it is not a good first choice of pain medication.  Doc. 89 at 476-77.  If a patient claimed to be taking 15 milligrams of Roxicodone five times each day, a pain management doctor might find that acceptable if he could verify through patient records, urinalysis, or prescription records that the patient actually had been taking that dose.  Doc. 89 at 477-78, 541.  One 15-milligram Roxicodone tablet would be equivalent in effect to three Percocet tablets, which is a commonly prescribed medication, post- surgery.  Doc. 89 at 478.

9.      Methadone is a synthesized opioid, which also is a pain reliever. Doc. 89 at 478-79.  Doctors prescribe methadone for either pain relief or as a treatment for heroin addiction.  Doc. 89 at 479.  Like Roxicodone, it is addictive.  Doc. 89 at 479. Methadone is more effective than Roxicodone for certain types of pain, and it is much less expensive than is Roxicodone.  Doc. 89 at 480.  A 40-milligram dose of methadone would be about four times as potent as 15 milligrams of Roxicodone.  Doc. 89 at 481.

10.     Xanax generally is prescribed for anxiety or panic attacks.  Doc. 89 at 481.  Xanax has an additive effect on Roxicodone and on methadone and can dangerously depress respiration in combination with those drugs.  Doc. 89 at 481- 82.

The effect of taking one milligram of Xanax is similar to the effect of drinking three to six beers in one hour.  Doc. 89 at 483.

11.     Flexeril, also known generically as cyclobenzapine, is a muscle relaxant and is not a controlled substance.  Doc. 89 at 483.  When combined with Roxicodone, it increases the drowsiness effect of both drugs.  Doc. 89 at 483.

12.     Neurontin, known generically as gabapentin, is used to treat patients for seizures and for pain management, although it is not a controlled substance, either.  Doc. 89 at 483-84.  Combined with Roxicodone, it adds to that drug's drowsiness effect.  Doc. 89 at 484.

13.     In 2007, a medical malpractice investigator for the State of Florida Department of Health received information regarding Dr. Sharon Johnston.  Doc. 88 at 160.  Johnston was an osteopath, specializing in neurology, working in Naples, Florida.  Doc. 88 at 164-65; Doc. 89 at 366.  The investigator reported the information to Naples Police Detective Amber Baginski, who was assigned to the Drug Enforcement Administration as a task force officer.  Doc. 88 at 160; see Doc. 88 at 170.  After speaking with the investigator and receiving additional information from the Naples Police Department and from the Florida Department of Health, Detective Baginski became convinced that the DEA task force needed to investigate whether Johnston was improperly prescribing powerful narcotics.  Doc. 88 at 171.

14.     Detective Baginski and a team of investigators decided to pose undercover officers as patients to see whether Johnston would prescribe narcotics inappropriately for them.  Doc. 88 at 171.  Detective Baginski explained at trial:

4

15.     "We were simply going to send in undercover officers and instruct them that they were to be new patients, not seen by Dr. Johnston before, and we instructed them not to bring any medical files, no prescription bottles, nothing at all that would show proof that they had had any kind of medical exam or had been given any prescriptions.  They were just going to go into the office and claim that they had pain, and see if they could obtain powerful narcotics."  Doc. 88 at 172.  Detective Mark Schaible, using the name Marcus Damm, and Detective Don McDougall, using the name Don Neiczticz, posed as the patients.  Doc. 88 at 172-73.  Detective Baginski also posed as a patient, using the undercover name Amber Needles.  Doc. 88 at 173.

16.     Wearing a hidden tape-recording device, Detective Schaible visited Johnston on June 11, 2007.  Doc. 88 at 185, 219.  Detective Schaible filled out a patient history form, indicating falsely that he had back pain.  Doc. 88 at 218.  He then was escorted to an examination room, where he awaited Johnston for about five minutes.  Doc. 88 at 219, 226.  When she arrived in the room, Detective Schaible told Johnston that he previously had been a patient of "Dr. Pizarro," and that a friend had referred him to Johnston after Pizarro's practice had closed.  Doc. 88 at 226-27; Gov't Exs. 2, 4.  (Pizarro actually had been arrested, and informants had told investigators that, if patients told Johnston that they previously had seen Pizarro, Johnston would prescribe any medication they requested.  Doc. 88 at 184, 211-12, 227.)  Johnston told Detective Schaible that Pizarro had been arrested, and Detective Schaible pretended that he did not already know.  Doc. 88 at 227-28; Gov't Exs. 2, 4.

17.     Johnston asked Detective Schaible what he had been doing for his "meds" since Pizzaro's practice had closed, and Detective Schaible claimed he had been "bum[ming] them off friends.  Whoever has them, they give me a couple here and there."  Doc. 88 at 228; Gov't Exs. 2, 4.  This should have alerted Johnston to the possibility that Detective Schaible might be convinced to sell his own medications.  Doc. 89 at 552.  Johnston asked Detective Schaible whether he had anything with Pizzaro's name on it, such as "records, or anything," but Detective Schaible said that he did not. Doc. 88 at 229; Gov't Exs. 2, 4.

18.     Johnston then asked Detective Schaible why he needed to take Oxycontin, and Detective Schaible claimed that he had injured himself while working out at a gym.  Doc. 88 at 230; Gov't Exs. 2, 4.  He claimed he had pain in his lower back, his shoulder, and "up here in the middle somewhere."  Doc. 88 at 230; Gov't Exs. 2, 4. Johnston asked him if he had pain going down his leg, and Detective Schaible replied, "In the back of my right leg, down towards my ankle, and then it come up the back of my leg.  But that's not too often as much as it hurts my back."  Doc. 88 at 230.  He complained that the pain was so bad that he was unable to sleep at night.  Doc. 88 at 230.

19.     Despite Detective Schaible's complaints of pain, Johnston did not physically examine him in any fashion.  Doc. 88 at 231.  She asked him if he had had an MRI, and Detective Schaible said that he had not because he did not have insurance. Doc. 88 at 231.  Johnston said that "sooner or later" he would probably need to have an

6

MRI done because he had "a herniated disk back there that's causing all the pain and . . . the next thing is shots, surgery, stuff like that." Doc. 88 at 232.

20.     Johnston then asked Detective Schaible to move back on the table so that she could test his reflexes by hitting his knees with a rubber mallet. Doc. 88 at 232-33. She then had Detective Schaible hold out his arms and lightly tapped the tips of his fingers, while they discussed Detective Schaible's many tattoos. Doc. 88 at 233-34. Johnston did not perform any further examination of Detective Schaible's physical abilities. Doc. 88 at 242. She should have performed a toxicology test on him to determine what controlled substances he actually was taking before considering prescribing drugs for him. Doc. 89 at 552.

21.     After taking Detective Schaible's blood pressure, see Doc. 88 at 236, Johnston told Detective Schaible, "I do a lot of pain nowadays, you know? Pretty much I do pain. . . . I used to do other stuff. . . . You know, stroke and . . . stuff like that." Doc. 88 at 237; Gov't Exs. 2, 4. She then asked Detective Schaible how many Roxicodone he took each day, and Detective Schaible said that he took up to five each day. Doc. 88 at 237; Gov't Exs. 2, 4. Johnston also asked Detective Schaible why he took Xanax, and Detective Schaible replied, "That's what [Dr. Pizarro] gave me." Doc. 88 at 237; Gov't Exs. 2, 4. Johnston asked if it was "just for [his] nerves or something," and Detective Schaible said, "Pretty much," explaining that he had been having difficulty keeping a job. Doc. 88 at 237; Gov't Exs. 2, 4. Johnston asked what dosage of Xanax Detective Schaible was taking, saying: "I mean, I'm assuming you're taking this stuff.

You know, if you are not taking this amount, don't do it the very first day, or the second, you know what I'm saying?  Because I have no idea, because- obviously you ran out of his med.  I don't know how much you're getting, or where you're getting it from.  Which is fine.  But I guess my point being is that your tolerance will not be the same if you are not taking it the way it's written. You know what I mean?"  Doc. 88 at 237; Gov't Exs. 2, 4.  Detective Schaible assured Johnston, "My tolerance will be fine, and we'll leave it at that . . .  I've been getting what I need." Doc. 88 at 238; Gov't Exs. 2, 4.  He said he had been taking up to three Xanax tablets each day.  Doc. 88 at 238; Gov't Exs. 2, 4.  Johnston commented that the combination of "Roxi and Xanax" was keeping Detective Schaible "nice and mellow" and said, "I always kind of wondered why you can go into a store and buy a gallon of vodka and a carton of cigarettes, you can have a good time, but you can't take a pain pill. . . .  Seems very strange to me"  Doc. 88 at 239; Gov't Exs. 2, 4.

22.    Johnston wrote Detective Schaible prescriptions for 150 Oxycontin tablets and for 90 Xanax tablets, giving him the maximum allowable dosage of Oxycontin (15 milligrams).  Doc. 88 at 241, 245; Gov't Exs. 1-B, 1-C, 2, 4.  Detective Schaible paid $250 in cash for the office visit, claiming that he had no insurance.  Doc. 88 at 247.

23.    Detective Schaible scheduled a follow-up appointment for July 9, 2007, but he called to reschedule the appointment for July 5, 2007, attempting to make it appear that he had quickly used up all the pills that Johnston had prescribed for him.  Doc. 88 at 249.  This should have alerted Johnston to the possibility that Detective

Schaible was not taking the medicine as prescribed or that he was selling his medication.  Doc. 89 at 553.  Upon arriving at the office, the receptionist asked Detective Schaible to pay his $150 fee up front.  Doc. 88 at 250.

24.     Detective Schaible told Johnston that he was working in landscaping and that his pain was incredible.  Doc. 88 at 256.  Referring to his dosage of Oxycontin, he said, "[T]he 15 is not cutting it."  Doc. 88 at 256; Doc. 89 at 351- 52; Gov't Exs. 6-A, 6-B.  Nothing from Detective Schaible's previous visit seemed to justify his claim that the Roxicodone dosage would not sufficiently alleviate his pain.  Doc. 89 at 553.  He confided to Johnston that a "buddy" of his had "some of those Methadone forties, wafers," and he said that he had been taking them with good results.  Doc. 88 at 256-57; Gov't Exs. 6-A, 6-B.  Johnston remarked that the increase from 15 milligrams of Oxycontin to 40 milligrams of Methadone was "quite a jump" and that Methadone was "real hard core."  Doc. 88 at 256; Gov't Exs. 6-A, 6-B.  Detective Schaible replied, "What else can I do, Doctor? . . .  I'm in so much pain and I have to go to work."  Doc. 88 at 256; Gov't Exs. 6-A, 6-B.

25.     Johnston asked Detective Schaible whether he was completely out of the pain medication she had prescribed, and he said, "Yes."  Doc. 88 at 258; Gov't Exs. 6-A, 6-B.  She then inquired:  "So the Methadone, how many is he supplying you with? Are you taking it like five times a day?"  Doc. 88 at 258; Gov't Exs. 6- A, 6-B.  Detective Schaible said that he was buying 20 tablets at a time from a friend and taking up to six each day.  Doc. 88 at 259; Gov't Exs. 6-A, 6-B.  Implying that he was selling some of the Methadone that he was getting from his friend, Detective Schaible said, "I don't buy

no more than that because, you know, he need to make some money too."  Doc. 88 at

259; Doc. 89 at 354-55; Gov't Exs. 6-A, 6-B.  Johnston asked Detective Schaible if

he thought that 150 Methadone tablets would be enough, and Detective Schaible, said,

"Yes," noting that he had another appointment scheduled in less than a month.  Doc. 88

at 259-60; Gov't Exs. 6-A, 6-B.  Johnston warned Detective Schaible, "You know, you

really . . . you've really got to be careful with anything to do-I know it's a buddy, but still."

Doc. 88 at 260; Gov't Exs. 6-A, 6-B.  She warned him to "be careful not to sell any,"

telling him that he did not "want to have gone to jail for some stupid ass stuff like that."

Doc. 88 at 260; Gov't Exs. 6-A, 6-B.  She told him that the past Friday night, 21 people

had been arrested for selling their prescription medications.  Doc. 88 at 261; Gov't Exs.

6-A, 6-B.  Detective Schaible interpreted Johnston's warning as a warning not to get

caught selling the Methadone.  Doc. 89 at 358-59.  Johnston also told Detective

Schaible: "[J]ust I'm saying be careful because you don't want to-you don't want

to get yourself [in a] position where you're in jail.  I mean that, to me, it's stupid, because

you could- right now, I can go buy a gallon of vodka and a carton of cigarettes, and go

home and have a good time, but I can't take a pain pill?  It seems stupid to me, but . . .

."  Doc. 88 at 261.

     26.    Johnston gave Detective Schaible a prescription for 150 40-milligram

Methadone wafers and refilled his Xanax prescription.  Doc. 88 at 264-66; Gov't Exs.

5-B, 5-C.  If Detective Schaible had been an actual patient who was taking this

medication, this rapid increase in pain medication would have put him at risk for a

severe side effect, such as an overdose, coma, respirator depression, or even death.

10

Doc. 89 at 487-88.  Detective Schaible's story that he had gone from taking 15 milligrams of Roxicodone (the lowest available dose) five times each day to 40 milligrams of Methadone several times a day was not particularly believable and should have alerted Johnston that something was amiss with his story.  Doc. 89 at 495, 498-99.

27.     Detective Baginski visited Johnston's office as a new patient on June 27, 2007.  Doc. 88 at 175-76.  Upon arriving at the office, Detective Baginski filled out paperwork while she awaited her visit with the doctor.  Doc. 88 at 176-77.  She noticed that the few other patients in the waiting room appeared to be high-their eyes were glassy and they appeared to be under the influence of drugs.  Doc. 88 at 179.

28.     After about 15 minutes, Detective Baginski was escorted to an examination room, where she awaited Johnston's arrival for about five more minutes.  Doc. 88 at 179.  After Johnston had introduced herself, Detective Baginski told Johnston that she had back pain very generally, that she had been seeing a doctor since November of 2006, and that she had been receiving 15 milligrams of Roxicodone.  Doc. 88 at 180.  Johnston did not ask Detective Baginski for any medical records, and she did not request her office staff to contact a pharmacist or anyone else to substantiate Detective Baginski's claims.  Doc. 88 at 180.  Johnston asked Detective Baginski if she previously had had an MRI, and Detective Baginski said that she had not.  Doc. 88 at 180-81.  Johnston suggested that Detective Baginski should think about getting one, but Detective Baginski said it would be too expensive.  Doc. 88 at 181.  She then asked Detective Baginski if a fall or an accident had caused the pain, and Detective Baginski responded, "No."  Doc. 88 at 181.  Johnston replied, "Most patients tell me that they

have had an accident or a fall when they're coming in here and saying that they have

back pain." Doc. 88 at 181. Still, Detective Baginski denied that she had suffered an

accident. Doc. 88 at 181.

29. Johnston then took Detective Baginski's blood pressure, tapped her

knees with a rubber mallet, and had her hold her hands out in front of her . Doc. 88 at

182. Johnston did not conduct any range-of-motion tests, did not ask her to move off of

the table, and, aside from placing the blood pressure cuff on Detective Baginski, never

touched Detective Baginski. Doc. 88 at 182. She did, however, say to Detective

Baginski, "Doesn't the pain radiate down your legs?" seeming to suggest to Detective

Baginski what she needed to say in order to obtain the pain medication. Doc. 88 at 182.

In total, Johnston examined Detective Baginski for less than five minutes. Doc. 88 at

183.

30. Detective Baginski and Johnston then had a very nonchalant

conversation about the doctor whom Detective Baginski supposedly had been seeing,

after which Johnston wrote Detective Baginski a prescription for 90 Roxicodone tablets,

15 milligrams. Doc. 88 at 183, 185; see Gov't Ex. 3B. As Johnston handed Detective

Baginski the prescription, she asked Detective Baginski whether she needed anything

else, but Detective Baginski said, "No." Doc. 88 at 185.

31. Detective McDougall visited Johnston posing as a new patient on July

10, 2007. Doc. 89 at 438. He met Johnston in an examination room, where Johnston

had Detective McDougall sit on an examination table. Doc. 89 at 440. He told Johnston

that he had some back pain, a stiff neck, and intermittent tingling down his arm. Doc.

89 at 440. Detective McDougall said that he had no pain that day, but he said that he was visiting Naples for the summer and he was worried that, if it flared up, he would need a prescription. Doc. 89 at 440. Detective McDougall claimed that he had a doctor in the Florida Keys, that he had had an MRI, and that the MRI had not revealed any reason for the pain. Doc. 89 at 440-41. He said that he was taking 20 milligrams of Oxycontin. Doc. 89 at 441. Johnston responded with surprise, saying that Detective McDougall was being over medicated, but she did not inquire about the name of Detective McDougall's doctor or ask how to contact him. Doc. 89 at 441.

32.     Johnston inquired why Detective McDougall was in Naples and what he did for a living. Doc. 89 at 442. Detective McDougall claimed that he was a fishing guide, which precipitated a discussion about fishing while Johnston took Detective McDougall's blood pressure, tapped his knees with a rubber mallet, and had him hold his arms out straight. Doc. 89 at 442. She asked how Detective McDougall had come to her, and Detective McDougall told her just through friends. Doc. 89 at 445. Johnston gave Detective McDougall prescriptions for 90 tablets of 30-milligram Roxicodone, 90 tablets of 100-milligram Neurontin, and 60 tablets of Flexeril, a muscle relaxant. Doc. 89 at 442. Johnston told Detective McDougall that the Roxicodone was an opiate, like Oxycontin. Doc. 89 at 443. (Oxycontin is time released, while Roxicodone is released immediately. Doc. 89 at 453.) She said that the Neurontin was a powerful drug that would help the Roxicodone. Doc. 89 at 443.

33.     According to an expert in pain management, Johnston did not sufficiently examine any of the undercover law enforcement officers or accurately diagnose their

maladies before prescribing controlled substances for their treatment.  Doc. 89 at 556-57.  Her provision of prescriptions of the strong medications to these officers fell outside the scope of professional practice.  Doc. 89 at 557.  Indeed, according to the expert, she prescribed these medications without any legitimate medical purpose.  Doc. 89 at 557.  (Johnston's expert witness testified to the contrary that Johnston's conduct had been "in keeping with the standards of good profession care in the United States" and that Johnston had acted "in good faith" in prescribing the medications to the undercover officers, Doc. 90 at 660-61, although he conceded that it would be "medically appropriate" to run objective tests on a person who claimed that he was suffering from pain, Doc. 90 at 701.)

34.     According to Johnston's long-time office manager, Christina Abner, about half of Johnston's practice was devoted to pain management.  Doc. 89 at 366. (Abner was Johnston's only office employee; she employed no nurses or other staff. Doc. 89 at 368.)   Johnston generally worked from about noon to 6:00 p.m., Monday through Friday, seeing 16 to 23 patients per day.  Doc. 89 at 366-67.  About 35-40 percent of her patients paid in cash, and most of her pain management patients paid in cash.  Doc. 89 at 367.  Johnston charged her cash patients $250 for their initial visits, and $150 for each follow up visit.  Doc. 89 at 88.

35.     Johnston prescribed controlled substances for about 99 percent of her pain management patients.  Doc. 89 at 381.  Some of the patients appeared to be high when they came into the office for an appointment.  Doc. 89 at 382-83.

14

36. One of Abner's duties as officer manager was to create a file for each new patient. Doc. 89 at 370-71. Among the documents that would go into each new file was a "patient progress notes" page, on which Johnston would note the patient's symptoms, diagnostic testing, impressions, and treatment plan. Doc. 89 at 371. Johnston had a standard, preprinted page, however, that she included in each patient file on which notes already had been completed indicating that various diagnostic testing had been completed and the patient's results were normal. Doc. 89 at 373-74, 378, 380; see, e.g., Gov't Exs. 8, 9, 10. She included this page in each new patient file before she had even seen or examined the patient. Doc. 89 at 373-74, 378, 380.

37. After she had been arrested and advised of her constitutional rights, Johnston commented: "I can go out and buy a gallon of vodka and a carton of cigarettes and go home and party, but I can't take a pain pill? To me, that's ridiculous." Doc. 88 at 188. She said that she did not take the weight of her patients because people do not like to be asked about their weight. Doc. 88 at 188. She also said that she did not ask patients for their prior medical records because she just takes patients at their word. Doc. 88 at 188.

## C. PETITIONER'S ARGUMENTS IN MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE

The Petitioner's arguments are as follows:

1.      The Petitioner alleges she received ineffective assistance of counsel because her counsel "failed to use documents that were in his possession to impeach government witnesses."  (Pet., at 21);

2.      The Petitoner alleges she received ineffective assistance because counsel "failed to call witnesses that were willing to testify" in Petitioner's trial.  (Pet., at 40);

3.      The Petitioner alleges she received ineffective assistance of counsel because counsel "introduced into the jury damaging inculpatory statements" that the Petitioner claims she never made.  (Pet. at 43);

4.      The Petitioner alleges she received ineffective assistance from her appellate counsel as well because that counsel failed to appeal what the Petitioner refers to as a "Crawford Violation" occurring during the trial.  (Pet. at 47).

## II.     MEMORANDUM OF LAW

The Sixth Amendment right to counsel is the right to effective assistance of counsel. McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970).  The benchmark for judging any claim of ineffective assistance of counsel, however, is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.  Strickland v. Washington, 466 U.S. 668, 688 (1984); see also Boykins v. Wainwright, 737 F.2d 1539, 1542 (11th Cir. 1984).  Because a lawyer is presumed to be competent to assist a defendant, the burden is on the accused to demonstrate the denial of the effective assistance of counsel.  United States v. Cronic, 466 U.S. 648, 658 (1984).  Ineffectiveness of counsel may be grounds for vacating conviction if (1) counsel's performance fell below an

16

objective standard of reasonable professional assistance and (2) the defendant was prejudiced by the deficient performance. Strickland, 466 U.S. at 687, 694. "There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697. Thus, if the defendant fails to show that he is prejudiced by the alleged errors of counsel, this Court may reject the defendant's claim without determining whether the counsel's performance was deficient. See Coulter v. Herring, 60 F.3d 1499, 1504 n.8 (11th Cir. 1995).

For performance to be deficient, it must be established that, in light of all the circumstances, counsel's performance was outside the wide range of professional competence. See Strickland, 466 U.S. at 690. In other words, when reviewing counsel's decisions, "the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc) (quoting Burger v. Kemp, 483 U.S. 776 (1987)). Furthermore, "[t]he burden of persuasion is on a petitioner to prove, by a preponderance of competent evidence, that counsel's performance was unreasonable." Chandler, 218 F.3d at 1313. This burden of persuasion, though not insurmountable, is a heavy one. See id. at 1314. "'Judicial scrutiny of counsel's performance must be highly deferential,'" and courts "must avoid second-guessing counsel's performance." Id. at 1314 (quoting Strickland, 466 U.S. at 689). "Courts must 'indulge [the] strong presumption' that counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" Id. (quoting

17

Strickland, 466 U.S. at 689-90).  Therefore, "counsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken 'might be considered sound trial strategy.'"  Id. (quoting Darden v. Wainwright, 477 U.S. 168 (1986)).

If the record is incomplete or unclear about counsel's actions, then it is presumed that counsel exercised reasonable professional judgment.  See id. at 1314-15 n.15. Thus, the presumption afforded counsel's performance "is not . . . that the particular defense lawyer in reality focused on and, then, deliberately decided to do or not to do a specific act."  Id.  Rather, the presumption is "that what the particular defense lawyer did at trial. . . were acts that some reasonable lawyer might do."  Id.

Moreover, "[t]he reasonableness of a counsel's performance is an objective inquiry."  Id. at 1315.  For a petitioner to show deficient performance, he "must establish that no competent counsel would have taken the action that his counsel did take."  Id. To uphold a lawyer's strategy, a court "need not attempt to divine the lawyer's mental processes underlying the strategy."  Id. at 1315 n.16.  Finally, "[n]o absolute rules dictate what is reasonable performance for lawyers."  Id. at 1317.

The Petitioner first alleges her trial counsel rendered ineffective assistance of counsel when he failed to use documents in his possession to impeach the Government witnesses' "perjured testimony."  A reading of the extensive and lengthy cross-examination of the witnesses the petitioner cites, by the very experienced and talented trial counsel, reveals that allegation to be flatly false.  (Cross examination at trial of witness Amber Baginski, pg. 190 -211, redirect pg. 212-213, Doc. 88; Cross

examination at trial of witness Don McDougall, pg. 446-464 (Note: the direct examination of this witness was only pg. 435-446, Doc. 89); Cross examination at trial of witness Susan Johnston, pg. 161-168, Doc. 88 (Note: the direct examination of this witness only was pg. 156-161, Doc. 88).

The Petitioner's lengthy argument in her motion (pg. 21- 39 of the Pet.) Is simply a statement of her point-by-point disagreements with the witnesses' testimony, without one specific allegation of ineffective assistance of counsel at all.  The Petitioner simply alleges all the witnesses against her committed perjury and the prosecutors committed misconduct (Pet., at 31, 32).   There is no showing of perjury and no showing of misconduct, and the Petitioner's first allegation has no merit.

The Petitioner's second allegation is that her defense counsel was ineffective because he didn't call defense witnesses that would have testified on her behalf.  She alleges, in Attachment G of her petition, but not in the petition itself, that the witnesses would have testified as to her "legitimate, caring, excellent medical care and attention" (Attachment G to Pet., pg. 2).  Wether the District court would have found this relevant (which would have been unlikely), defense counsel was well aware the Government had numerous witnesses available who did not testify in the Government's case in chief, who suffered greatly under the Petitioner's care, that could be called on rebuttal after the defense had rested its case.  Defense counsel wisely chose not to open that door and have former patient after former patient of the Petitioner testify as to the damage the Petitioner did to their lives.

The Petitioner's third allegation is that her counsel "introduced into the jury" a statement she never made.  This allegation is without merit.  The only statement she points to was made on the witness stand by the witness Mark Schaible.  Defense counsel merely attempted to cross-examine the witness on the statement.  The fact that the witness claimed she made a statement that she denies making, and the defense counsel cross-examined the witness about the statement, is not ineffective assistance of counsel by any standard; in fact, it is _effective_ assistance of counsel.  The statement made by the witness, somewhat ironically, is not prejudicial at all, but exculpatory: that the undercover witness "will no longer have to buy drugs off the streets again."

The Petitioner's last allegation is also without merit.  The Petitioner alleges a violation of her right to confront the witnesses against her, in this case Investigator Susan Johnston of the State of Florida Department of Health.  The Petitioner says she would have had her defense counsel (and then, on appeal, her appellate counsel) say that her rights were violated when the Government did not elicit the hearsay nature of the complaints against the Petitioner reported to that investigator.  Defense counsel had the opportunity to explore that area on cross-examination, and chose not to delve into the serious complaints made against the Petitioner, which at that point had not been investigated or established.  Again, the Petitioner actually faults her counsel for being an effective counsel; and alleges ineffectiveness of her appellate counsel for not bringing up a frivolous claim on appeal.

## H.    STATEMENT ON NEED FOR AN EVIDENTIARY HEARING

The Petitioner is not entitled to an evidentiary hearing.  The Petitioner has the burden of establishing the need for an evidentiary hearing, see Birt v. Montgomery, 725 F.2d 587, 591 (11th Cir. 1984) (en banc), and she would be entitled to a hearing only if her allegations, if proved, would establish her right to collateral relief, see Townsend v. Sain, 372 U.S. 293, 307 (1963).  "Under Rules Governing Section 2255 Cases, Rule 4(b), a district court faced with a § 2255 motion may make an order for its summary dismissal "[i]f it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief[.]" Broadwater v. United States, 292 F.3d 1302, 1303 (11th Cir. 2003) (quoting 28 U.S.C. foll. § 2255).    Accordingly, no hearing is required when the record establishes that a section 2255 claim lacks merit, see United States v. Lagrone, 727 F.2d 1037, 1038 (11th Cir. 1984), or that it is defaulted see McCleskey v. Zant, 499 U.S. 467, 494 (1991).

The Petitioner has not established any basis for an evidentiary hearing because her arguments are without merit and based on faulty reasoning.

WHEREFORE, the Petitioner's section 2255 motion should be denied.

Respectfully submitted,

A. BRIAN ALBRITTON
United States Attorney

By:    *s/Douglas Molloy*
       DOUGLAS MOLLOY
       Chief Assistant United States Attorney
       Fort Myers Division
       Bar No. 0316717
       2110 First Street, Suite 3-137
       Telephone:   (239) 461-2200
       Facsimile: (239) 461-2219
       E-Mail:      douglas.molloy@usdoj.gov

DATE: May 17, 2010

**SHARON JOHNSTON V. UNITED STATES**          **Case No. 2:10-cv-180-FtM-29DNF**

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2010, a true and correct copy of the foregoing

document and the notice of electronic filing was sent by United States Mail to the

following non-CM/ECF participants:

Sharon Johnston, #34400-018
Federal Correctional Institution
4102 West Hillsboro Avenue
Tampa, Florida 33614

and

Sharon Johnston
1425 Canterbury Drive
Clearwater, FL 33756

*s/Douglas Molloy*
DOUGLAS MOLLOY
Chief Assistant United States Attorney
Fort Myers Division
Bar No. 0316717
2110 First Street, Suite 3-137
Telephone:   (239) 461-2200
Facsimile:   (239) 461-2219
E-mail:      douglas.molloy@usdoj.gov